**Nilda KELLER et al., Plaintiffs,**

v.

**KATE MAREMOUNT FOUNDATION et al., Defendants.**

**No. C-71 1585 RFP.**

United States District Court,
N. D. California.
June 15, 1972.

David B. Bryson, National Housing & Economic Development Law Projects, Berkeley, Cal., for plaintiffs.

Allan M. Berland, Elkus & Berland, San Francisco, Cal., John B. Bigelow, Contra Costa Legal Services Foundation, Richmond, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

PECKHAM, District Judge.

Plaintiffs are tenants in a 221(d)(3) housing project known as "Crescent Park", owned and operated by the defendant Kate Maremount Foundation. The 221(d)(3) program was established by the Housing Act of 1961, Pub.L. 87–70, and is designed to encourage the production of housing for low- and moder-

ate-income families. The landlord of a 221(d)(3) project receives a subsidy from HUD in the form of a three per cent interest rate on the mortgage loan that finances the project. This subsidy is intended to reduce the capital costs of the project and thus enable the sponsor to offer decent housing at reasonable rates to low- and moderate-income families.

Further assurance that the project will serve such families is provided by those sections of the statute and regulations that require HUD to regulate the rents charged in a 221(d)(3) project. HUD exercises this power by requiring the sponsor to agree not to charge rents higher than those approved by HUD and to apply to HUD for approval if he wishes to increase the rents. These requirements are set out in the regulatory agreement that a sponsor signs when undertaking a 221(d)(3) project. In addition, HUD establishes maximum annual income limits for families seeking to live in the projects.

■ On February 16, 1971, the San Francisco Area Office of HUD received a letter from the Director of the Kate Maremount Foundation requesting an approval of a general annual rental increase. After some consideration the San Francisco Area Office informed the mortgagor in a letter dated March 15, 1971 that the maximum permissible rent had been recalculated. The defendant landlord began instituting rental increases on May 1, 1971, and thereafter as the leases expired. There is a dispute of fact as to whether the March 15 letter authorized the approval of an immediate rise in rent or whether such approval was contingent upon submission by defendant of FHA Form No. 2458, which deals with rent schedules and rent information. The Government has switched positions on this point; in its memorandum of November 22, 1971, it states that final approval was received on August 3, 1971; in its memorandum of December 15, 1971, it asks the court to disregard the statement ·in the No-

vember 22 memorandum and find that final approval was granted in the letter of March 15, 1971. From the submitted affidavits, it appears that HUD did in fact give final approval to Kate Maremount Foundation for rent increases in its March 15, 1971 letter, and. this shall be the finding of the court.

Plaintiffs have asserted that the rent increases were approved in violation of the due process clause. Specifically, they contend that tenants in a 221(d) (3) project are entitled to certain due process safeguards before the FHA or HUD can approve a rental increase. Defendants vigorously oppose this contention, on a number of grounds, and both sides have moved for summary judgment.

Jurisdiction exists under 28 U.S.C. § 1361. See Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970), and Geneva Towers Tenants Organization, et al. v. Federal Mortgage Investors et al., Northern District of California, C–70–104, Slip Opinion filed January 3, 1972.

1) *Is there sufficient public action to invoke the due process clause?*

■ Obviously, the Fifth Amendment applies only to the Federal Government and not to private individuals. See Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). The first question one must encounter is whether there is sufficient federal action to say that the due process clause applies.

It is generally conceded in the case law that the standards for finding "federal action" in applying the due process clause of the Fifth Amendment are no different from the standards for finding "state action" under the due process clause of the Fourteenth Amendment. See, e. g., Kadlec v. Illinois Bell Telephone Company, 407 F.2d 624 (7th Cir. 1969); Bright v. Isenbarger, 314 F. Supp. 1382 (N.D.Ind. 1970). Some judges, however, have suggested that the state action requirement in *racial discrimination cases* should be less stringent than in all other Fourteenth and

Fifth Amendment cases. See Coleman v. Wagner College, 429 F.2d 1120 (2nd Cir. 1970) (Friendly, J., concurring); Bright v. Isenbarger, *supra.* See also C. Black, " 'State Action', Equal Protection, and California's Proposition .14", 81 Harv.L.Rev. 69 (1967). This view, for the most part, has not been accepted, and courts have been extremely liberal in finding state action on rather indirect state participation. See, e. g., Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (state. action found where state ordinance required trailer-owner to live in a trailer park, and where operator of trailer park may have infringed upon plaintiff's first amendment rights).

If we accept the view that non-racial discrimination cases should be treated with the liberal standard of the racial discrimination cases, the participation of the government here is clearly sufficient to find "state", or federal, action. Compare Burton v. Wilmington Parking Authority, *supra.*

If we treat non-racial discrimination cases differently, however, a deeper inspection is required. Judge Friendly, the leading proponent of the bifurcated state action standard, seemingly found no governmental action in a case nearly identical to the present one. Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971). However, the other courts that have considered the 221(d)(3) projects have *all* found sufficient federal action to invoke the Fifth Amendment. See Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970); McKinney v. Washington, 143 U.S.App.D.C. 4, 442 F. 2d 726 (1970); Geneva Towers Tenants Organization v. Federal Mortgage Investors, et al., N.D.Cal. C–70–104 SAW, Slip Opinion January 3, 1972; Marshall v. Romney, C–2288–70 (D.D.C.1971). The court must respectfully disagree with Judge Friendly and the Second Circuit and hold that there is sufficient federal action to invoke the due process clause. The FHA pays the landlords an attractive subsidy; HUD must approve all rents; and HUD sets the income limits

for families seeking to live in the projects.

Courts have applied the Fifth Amendment in non-racial discrimination cases with a much lesser showing of state or federal action than exists here. For example, in Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L. Ed. 1068 (1952), the Supreme Court held that the Fifth Amendment did apply when the extent of federal participation was simply that the Public Utilities Commission, an agency of Congress, supervised in a regulatory manner the D. C. Transit Authority; the fact that the Transit Authority had a monopoly was inconsequential. Also, a recent First Circuit opinion found state action in a non-racial discrimination case on less state participation than exists here. Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972). The extent of the state action in that case was simply that a state ordinance required trailer-owners to live in a trailer park; hence, plaintiff could maintain a § 1983 action against the owner of the trailer park for an alleged deprivation of first amendment rights.

Indeed, the "state action" debate generally takes place at a much lower level of government involvement than exists here, such as whether the state's establishing of educational standards in private schools and universities makes the disciplinary proceedings of those institutions "state action" for due process purposes. See Powe v. Miles, 407 F.2d 73 (2d Cir. 1968); Bright v. Isenbarger, 314 F.Supp. 1382 (N.D.Ind. 1970).

Under either approach there is a federal action here, and the due process clause of the Fifth Amendment should apply.

2) *Are the interests involved worthy of due process protection?*

█ It is important to note at the outset that, in order to receive some due process protection, the interests in dispute need not reach the level of the traditional constitutional "right". Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95

L.Ed. 817 (1951); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

> "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg, supra,* at 263, 90 S.Ct. at 1018.

■■ Due process analysis requires that two factors be considered: the precise nature of the governmental function and the private interest that will be affected by the government action. Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The "precise nature of the governmental function" has already been discussed. (See opening paragraph on p. 1). Clearly the *private interest* involved is most significant. As Judge Weigel noted in his opinion in *Geneva Towers, supra*: "A more devastating impact on family living than the loss of housing is difficult to imagine." Slip Opinion, at 5. In the present case rents were raised from 8 to 10 per cent; for some tenants this may be tantamount to eviction.

Given that the "interests" of welfare benefits [Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)], unemployment benefits [Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)], attending a public school [Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961)], public employment [Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)], probation revocation [Hahn v. Burke, 430 F.2d 100 (7th Cir. 1970)], teaching in public high schools [Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir. 1970)], teaching at a public university [Roth v. Board of Regents of State Colleges, 446 F.2d 806 (7th Cir. 1971)], not being evicted from a public housing project [Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970), and supporting language of this position in Glover v. Housing Authority of City of Bessemer, Ala., 444 F.2d 158 (5th Cir. 1971)], practicing medicine in a hospital and not being dismissed from the hospital staff [Woodbury v. McKinnon, 447 F.2d 839 (5th Cir. 1971)], and not being transferred to the maximum security section of a hospital when simply a patient accused of a crime [Jones v. Robinson, 142 U.S.App.D.C. 221, 440 F.2d 249 (1971)], have all received some or all of the protections set forth in Goldberg v. Kelly, the court considers as an appropriate interest for the Goldberg v. Kelly balancing test the interest of not having the rent raised in a publicly-financed housing project and, for some tenants, not being evicted from such a project because of a rental increase. In other words, the private interests in question here are "worthy" of being balanced against the burden to the defendants if certain due process safeguards are implemented.

3) *To what extent should the private interests here receive due process protection?*

■ Several other courts have considered this problem:

a) Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970)—This case held that due process does *not* require a *hearing* before the FHA approves a rental increase in a 221(d)(3) project. However, several limitations or points of disagreement in that opinion should be noted. First, the court considered only the right to a hearing; from Judge Coffin's analysis it appears that the court might have accepted less cumbersome procedures, such as the right to notice or the opportunity to present written objections. Second, the court considered the proposed hearings to be "legislative" rather than "adjudicative", and based a great deal of its opinion on this distinction. It would seem, however, that the hearings would be adjudicative.[1] Finally, the First Circuit

---

1. The Second Circuit concurs that the hearings would be adjudicative in nature. See Langevin v. Chenango Court, Inc., *supra.*

believed that a rent increase does not pose a threat as serious as the termination of welfare benefits, or the denial of a security clearance, or eviction from a low-rent housing project. The court must respectfully disagree with the First Circuit here, for the reasons discussed above. See also *Geneva Towers, supra*. A 10 per cent increase in rent can be extremely serious for a low-income family; indeed, some have argued that a rise in rent may be tantamount to eviction for tenants such as plaintiffs here. See the dissent in *Langevin, supra*.

b) Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971)—Here, the Second Circuit declined to implement any due process procedures on the grounds "that here the Government did not itself increase the rents but simply allowed the landlord to institute an increase upon the termination of existing tenancies." 447 F.2d at 301. The court has several observations about this decision. First, Judge Friendly believed the "significant distinction" is that the Government itself did not increase the rents; thus, he seems to be saying that the due process clause does not even apply. But in part 1) above this court concluded that there *was* sufficient government participation to conclude that the due process clause applies. At this stage of the analysis we must be concerned with whether the interests of the government in the procedures adopted outweigh the citizen's interest in greater procedural safeguards. Goldberg v. Kelly, 397 U.S. at 263, 90 S.Ct. at 1018; Hahn v. Gottlieb, *supra,* 430 F.2d at 1247.

Second, Judge Friendly seems to say that if the Government had itself increased the rent, then due process *would* require a hearing or other procedural safeguards. This observation is supported by a footnote which mentions Escalera v. New York City Authority, 425 F.2d 853 (2d Cir. 1970). In *Escalera* the Second Circuit held that no tenant in a public-housing project could be evicted without the Goldberg v. Kelly

due process safeguards. Judge Friendly, in his footnote, says that the distinction between the case before him and *Escalera* was the element of government as landlord, "rather than the degree of injury". One could read this to say that, for the purposes of applying the due process safeguards, there exists no significant difference in the injury or harshness facing the plaintiffs in the two cases.

It should also be pointed out that Judge Oakes dissented strongly in *Langevin*; he favored a hearing and full due process protections. Judge Oakes believed there was no significant distinction between the facts in *Langevin* and *Escalera*. Two quotations from his dissent are particularly interesting:

1. "The distinction advanced by the majority, that here the Government did not itself increase the rents but simply allowed the landlord to institute the increase, is to me a distinction without a difference." 447 F.2d at 304.

2. "Similarly, eviction because of inability to pay higher rent here is no different from eviction for having a dog in violation of project rules in *Escalera*; one supporting affidavit submitted below was from a former tenant who had to move because of a 10 per cent increase." 447 F.2d at 305.

c) McKinney v. Washington, 143 U.S. App.D.C. 4, 442 F.2d 726 (1970)—This case involved a project similar to the 221(d)(3) project in the present case. The D.C.Circuit simply followed Hahn v. Gottlieb, *supra,* and held that 1) the due process clause did apply; but 2) the plaintiffs were not entitled to a hearing under the Goldberg v. Kelly test.

d) Marshall v. Romney, D.D.C., Civil Action 2288–70, Slip Opinion of June 15, 1971—This case did involve a 221(d)(3) project, and the opinion contains language sympathetic to the tenants; however, the court held that its decision was controlled by the holding of its own Circuit in *McKinney.*

e) Geneva Towers Tenants Organization v. Federal Mortgage Investors, et

al., N.D.Cal., C–70–104 SAW, Slip Opinion of January 8, 1972.—My colleague Judge Weigel balanced the interests and decided that 1) a hearing was simply too cumbersome; but that 2) "due process requires that tenants be given notice of their lessor's application for approval of rent increases; that tenants have a reasonable opportunity to make written objections thereto; and that tenants be furnished with a concise statement of FHA's reasons for approving an increase." Slip Opinion at p. 5.

Judge Weigel believed that a hearing was too burdensome to the FHA and to the landlord, vis a vis the benefits to the tenants, and eventually could deter private parties from investing in the public housing projects. On the other hand, Judge Weigel believed that certain due process safeguards could be quite helpful to the tenants and not too cumbersome for the landlord or for HUD.

Of the three possible outcomes with the balancing test—1) no procedural safeguards (Hahn v. Gottlieb); 2) right to a hearing and other attendant procedural safeguards (Judge Oakes' dissenting position in *Langevin*); or 3) *some* procedural protections but no right to a hearing (*Geneva Towers*)—the court finds most acceptable the position taken in *Geneva Towers, supra*. The defendants' main point—echoed in *Hahn, supra* —is that the due process procedures could make investment in a 221(d)(3) project so unattractive as to discourage private investment, with the end result that "we kill the goose in our solicitude for the eggs." 430 F.2d at 1246. This point is well-taken, and the court believes that, under the Goldberg v. Kelly balancing test, the value of a public hearing does not outweigh the risk and burdens to both the Government and to the private landlord. On the other hand, it is difficult to see how the procedures suggested by Judge Weigel will significantly discourage private investment in publicly-supported housing programs. It is the view of this court that the benefits to the tenants if these procedures are implemented outweigh the burden to the defendants and the risks of setbacks to the program. Consequently, the court concludes that the due process clause compels a) that tenants be given notice of their lessor's application for approval of rent increases; b) that tenants have a reasonable opportunity to make written objections thereto; and c) that tenants be furnished with a concise statement of FHA's reasons for approving an increase.

## ORDER

It is hereby ordered, in light of the foregoing Memorandum of Decision, that:

1. FHA reconsider *de novo* the application of the Crescent Park Project for rent increases.

2. Said reconsideration shall be undertaken in a manner consistent with the Constitutional rights of plaintiffs as defined and declared in the Memorandum of Decision.

3. Pending said reconsideration, the tenants shall continue to pay the present rent rates to the defendant landlord.

4. Should FHA re-approve the rent increases, the monies paid to the landlord since May 1, 1971 shall remain with said landlord.

5. Should FHA deny the application, in whole or in part, the landlord shall pay each tenant or former tenant the amount of rental increase each tenant or former tenant has paid since May 1, 1971.

6. This Memorandum of Decision and Order shall constitute the Court's findings of fact and conclusions of law.